794 A.2d 669

**Folake Odejinmi BROWN, et al.**

v.

**CONTEMPORARY OB/GYN ASSOCIATES, et al.**

**No. 1033, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

March 27, 2002.

Taiwo A. Agbaje of Windsor Hill, MD, for appellants.

Kenneth Armstrong and Robert R. Michael (Armstrong, Donahue, Ceppos & Vaughan, Chartered and Shadoan & Michael, LLP on the brief, for appellees Contemporary, Levitt, Rosenblatt & Goodman), Rockville, MD.

David A. Roling (David A. Levin and Wharton, Levin, Ehrmantraut, Klein & Nash, on the brief, for appellees Holy Cross, Craddock and McKibben), Annapolis, MD.

Argued before HOLLANDER, SONNER, LAWRENCE F. RODOWSKY (Retired, specially assigned), JJ.

HOLLANDER, J.

This appeal arises from the unfortunate death of a baby girl who was born prematurely in May 1994 to Folake Odejinmi Brown and Richard Afolabi Brown, M.D., appellants,[1] at Holy

---

[1]. In addition to Dr. and Ms. Brown, the baby's estate is a party to this appeal. We shall refer to the Browns and the baby's estate collectively as "appellants."

Cross Hospital of Silver Spring, Inc. (the "Hospital" or "Holy Cross"). On May 9, 1997, appellants filed a malpractice claim with the Maryland Health Claims Arbitration Office.

After arbitration was waived, appellants filed a five-count complaint on December 10, 1997, in the Circuit Court for Montgomery County. The suit named sixteen defendants, including Contemporary OB/GYN Associates ("Contemporary"), the obstetrical practice that cared for Ms. Brown; Contemporary's individual physicians and their respective professional associations; Holy Cross; and two of the Hospital's nurses, all appellees herein.[2] Appellants sought compensatory and punitive damages of $20 million in connection with their claims for wrongful death (Count I); a survival action (Count II); health care malpractice (Count III); breach of contract (Count IV); and intentional infliction of emotional distress (Count V).

Prior to trial, the circuit court granted summary judgment in favor of Holy Cross, Dr. Jeffrey Levitt, Dr. Goldberg, Dr. Brooks, and the two nurses, McKibben and Craddock. As to Contemporary, Dr. Donald Levitt, Dr. Goodman, and Dr. Rosenblatt, the court granted summary judgment as to the claims of wrongful death, the survival action, and punitive damages.

Thereafter, the court bifurcated the issues of liability and damages. Accordingly, as to the remaining defendants, the case proceeded to trial on liability in June 1999 (Mason, J.),

---

We note that in November 2001, after oral argument had been held in this case, appellants filed a Motion to Proceed Pro Se and For Future Substitute of An Attorney. We shall grant appellants' request.

**2.** Specifically, in addition to Contemporary and Holy Cross, appellants sued Michael Goodman, M.D. and Michael Goodman, M.D., P.A. ("Dr.Goodman"); Marvin Rosenblatt, M.D. and Marvin Rosenblatt, M.D., P.A. ("Dr.Rosenblatt"); Donald G. Levitt, M.D. and Donald G. Levitt, M.D., P.A. ("Dr. Donald Levitt"); Jeffrey Levitt, M.D. and Jeffrey Levitt, M.D., P.A. ("Dr. Jeffrey Levitt"); Stephen R. Goldberg, M.D. and Stephen R. Goldberg, M.D., P.A. ("Dr.Goldberg"); Roy Brooks, M.D. and Roy Brooks, M.D., P.A. ("Dr.Brooks"); and Paulette Craddock, R.N. and Maya McKibben, R.N., nurses at Holy Cross.

with respect to the claims of health care malpractice and intentional infliction of emotional distress. At the trial, Newton Osborne, M.D., Ph.D., a professor of obstetrics and gynecology at Howard University Hospital ("Howard" or "Howard Hospital"), and chairman of the Department from 1994 to 1997, testified as an expert for appellants. After the court determined that he offered an opinion that had not been previously disclosed to opposing counsel, the court granted a mistrial. A second trial, as to both liability and damages, commenced in January 2000 (Woodward, J.). It, too, ended in a mistrial, apparently because a juror overheard certain comments by a lawyer representing the Hospital.

In the meantime, after the second trial, and without appellants' knowledge, Dr. Osborne's employer, Howard Hospital, retained H. Kenneth Armstrong, Esq., to represent Dr. Osborne in a medical malpractice action filed again him and others in the District of Columbia (the *"Singleton"* case). At that time, Armstrong was also the attorney for Contemporary and its physicians in this case (hereinafter sometimes referred to as the *"Brown"* case). Nevertheless, Dr. Osborne and Armstrong did not plan to meet to discuss the *Singleton* case until after the trial in the *Brown* matter was completed. As a result of the second mistrial, that matter did not end when anticipated. Nevertheless, prior to the third attempt to try the underlying case, Armstrong met with Dr. Osborne to discuss the *Singleton* litigation.

After the commencement of the third trial in March 2000, appellants learned that Armstrong represented Dr. Osborne in the *Singleton* matter. During the course of the third trial, appellants also learned that Dr. Osborne was out of the country and unavailable to testify as their expert. They also discovered that Armstrong knew that Dr. Osborne would be unavailable at that time, yet had failed to disclose that information to appellants. The court (John McAuliffe, J.) attributed Dr. Osborne's unavailability to appellants' failure to subpoena the doctor, but permitted appellants to put in evi-

dence the testimony of Dr. Osborne, elicited at the first trial in June 1997.

On appeal, appellants present the following four questions:

I. Did the [t]rial [c]ourt err in denying the Plaintiffs' Motion for a Mistrial and Post-trial Motion for a new trial where the court had before it evidence of witness tampering by defense [c]ounsel, Kenneth Armstrong, Esquire, when he had undisclosed and unsupervised access to Appellants' expert and he became attorney for Appellants' expert in an unrelated case shortly before Appellants' expert was scheduled to testify in this case; which caused or contributed to the **absence** of Appellants' expert witness at trial; which had [a] prejudicial effect upon Appellants' ability to present their case at trial; which deprived Appellants [of] a fair trial; and was prejudicial to the administration of justice in this case[?]

II. Did the trial [c]ourt err in allowing testimony of defense expert Lindsay Alger who rendered new opinions at trial which were prejudicial to Appellants' case, which had never been rendered before and Appellants were not put on reasonable notice of those opinions at anytime before trial[?]

III. Did the trial [c]ourt err when it ordered the use of Dr. Osborne's previous trial testimony at the March 2000 trial which did not contain testimony regarding [m]ental anguish that Dr. Osborne had prepared to render at the June 1999 trial but for the bifurcation of the trial and the objection of Appellees[?]

IV. Did the trial [c]ourt err where the [c]ourt gave an incorrect instruction to the jury that a wrongful death claim could not be brought by the Plaintiffs because the baby was non-viable without advising the jurors that that [sic] under Maryland law, a wrongful death suit may be maintained if a nonviable fetus was born alive[?]

For the reasons that follow, we shall affirm.

### FACTUAL BACKGROUND[3]

In January 1994, Ms. Brown came under the prenatal care of Contemporary. At that time, she had already endured four unsuccessful pregnancies, and was experiencing difficulties in the early stages of the pregnancy at issue, including infection and vaginal bleeding.

On May 12, 1994, when Ms. Brown was twenty-two weeks pregnant, she had severe abdominal pains and contractions. As a result, Dr. Brown took his wife to the Hospital's emergency room, where she was examined by Craddock and McKibben. The nurses then contacted Dr. Goodman, the physician on call for Contemporary. He told the nurses to discharge Ms. Brown and instruct her to follow up with Contemporary the next day. Accordingly, Ms. Brown was examined the next day by Dr. Rosenblatt. After an ultrasound revealed that Ms. Brown was dilated four centimeters, she was admitted to Holy Cross. The baby was delivered by Dr. Donald Levitt on May 13, 1994. During the delivery, the baby's head was severed from its body.

At the first trial in June 1999, Dr. Osborne opined that the premature delivery was caused by an undiagnosed "lower genital tract infection" that "eventually progressed to an upper genital tract infection with amnionitis and chorioamnionitis, and caused a contraction of the uterus that resulted in a [premature] delivery." Defense counsel claimed that Dr. Os-

---

**3.** We observe that in appellants' thirty-one page brief, they cite only two cases, four rules, and two ethics opinions. Moreover, their "Statement of Facts," set out on pages 14 through 20 of their brief, is almost identical to portions of the "Statement of the Case," contained on pages 1 through 12 of their brief. In addition, the Record Extract of 702 pages omits important testimony and does not conform to Rule 8–501(c) or Rule 8–501(h). To address the deficiencies, one group of appellees submitted an appendix that exceeds 400 pages, but it is equally difficult to use. For example, one portion of testimony included in the Appendix runs into the next, without any indication or identification of the name of the particular witness whose testimony is included. Further, the table of contents lists the trial dates and corresponding pages of the Appendix, without identifying the particular witness. Such deficiencies and errors unnecessarily add to the time that it takes us to review the record and prepare an opinion.

borne's opinion had not been disclosed by appellants prior to trial, in violation of the Pretrial Scheduling Order. Therefore, appellees moved for a mistrial. Although the court recognized that the disputed opinion was "so important" to the plaintiffs' case, it found that they never disclosed the opinion "in any reasonable form," or "at any time...." Accordingly, the court granted a mistrial, stating:

> [T]o allow the case to proceed in the absence of any kind of reasonable disclosure, which I do not find from my review of the record, would in fact unfairly and severely prejudice the defendants.
>
> Accordingly, over the objection of the plaintiffs, I will grant the motion for the mistrial.

Because the court also struck the bifurcation, the trial was rescheduled for January 10, 2000, as to both liability and damages.

In the meantime, on or about September 2, 1999, Dr. Osborne was sued in the District of Columbia for malpractice, in his capacity as Chairman of Howard's Department of Obstetrics and Gynecology, in the *"Singleton"* case. In December 1999, a representative of Howard Hospital contacted Armstrong and asked him to represent Dr. Osborne in that unrelated matter. Although appellants were not aware of the request, Armstrong knew, of course, that Dr. Osborne was appellants' expert in the case *sub judice*. In a telephone conversation with Dr. Osborne on January 5, 2000, Armstrong advised the doctor of his willingness to represent him. But, mindful of the impending trial in this case, he suggested that they defer meeting until after the conclusion of the second *Brown* trial, then scheduled to commence on January 10, 2000. Armstrong also advised Dr. Osborne that it would be inappropriate for the two of them to discuss the *Brown* litigation at any time.

Armstrong confirmed his telephone conversation with Dr. Osborne by letter of January 6, 2000, stating:

> This will confirm our telephone conversation of January 5, 2000. At that time, we discussed that I had been retained

by Howard University Hospital to represent your interest in a lawsuit brought by the Singleton family in the Superior Court for the District of Columbia, Civil Action No. 99–0006001.

We have a meeting set up in my office for Thursday, January 20, 2000 at 10:00 a.m.

\* \* \*

This will also confirm that I specifically advised you that I will *not* discuss the *Brown* litigation with you at any time. In addition, I specifically set our first meeting to discuss the *Singleton* case for *after* the *Brown* case is concluded in the Circuit Court. While I do not believe that your participation as an expert in the *Brown* case will prevent us from having a completely appropriate and satisfactory attorney/client relationship, I did not want to discuss any matters with you in the *Brown* case at all as I am preparing in my last couple of days prior to the beginning of that trial. *Feel free to advise [appellants' counsel] that I will be representing you in the litigation and that we will not discuss the Brown case if you feel that you would like to do so.*

I look forward to meeting you on the 20th [of January, 2000].

(Italics added).

On January 6, 2000, appellants' counsel deposed an expert witness of the appellees. In preparation for that deposition, appellants' counsel met with Dr. Osborne, but the doctor did not disclose that Howard Hospital had retained Armstrong to represent him in another matter. Armstrong entered his appearance as attorney for Dr. Osborne in the *Singleton* case on January 7, 2000, three days before the second trial in the instant case was scheduled to begin.

Although the second trial commenced on January 10, 2000, as scheduled, it ended in a mistrial the next day. As the court told the jury, "during one of the recesses a representative of a former Defendant in this case was overheard by several jurors making comments about this case." That same day, the parties agreed to yet a third trial date—March 20, 2000.

Thereafter, appellants' counsel sent a letter to Dr. Osborne on January 16, 2000, informing him that the case had been rescheduled for trial beginning on March 20, 2000. The letter provided, in part:

> We have a new trial date in two months beginning on March 20, 2000. It is a 10 day trial. Please mark your calendar. As usual, I will contact you shortly before the trial to meet you to prepare for this case.

Dr. Osborne did not respond to the letter, nor did he ever advise appellants' attorney as to his availability for trial.

Although the *Brown* matter was not resolved by January 22, 2000, the date Dr. Osborne was to have his initial meeting with Armstrong concerning the *Singleton* case, Armstrong decided to proceed with the meeting, because the deadline for a responsive pleading was approaching. As a result of that meeting, Armstrong learned that Dr. Osborne would not be available when the third trial in the *Brown* case was set to commence on March 20, 2000. By letter dated January 27, 2000, Armstrong wrote to Dr. Osborne about their meeting of January 22, 2000. The letter said, in part:

> *I understand that you will be out-of-town in late February [2000] to Venezuela and the week of March 21 [2000] to Panama.* We should hopefully have a number of things happening before you go to Panama. In the meantime, if you have any questions, please do not hesitate to contact me.

(Emphasis added).

As scheduled, the third jury trial in the *Brown* case began on March 20, 2000. On the morning of March 22, 2000, one of appellants' attorneys advised the court that he had just learned on March 21, 2000, that Dr. Osborne was out of the country at a medical conference and was unavailable to testify until Monday, March 27, 2000, "at the earliest."[4] The court

---

4. In a post-trial deposition of Dr. Osborne taken on March 29, 2000, Dr. Osborne explained that, at the time of the third trial, he "had a

initially said: "That is not acceptable. We can't wait till then . . .," because "it would set us way back. . . ."

Armstrong indicated to the court that he had no knowledge of Dr. Osborne's unavailability. The following colloquy is relevant:

[APPELLEES' COUNSEL]: As you know from our scheduling discussions, Dr. Alger [, the defense's expert witness,] is scheduled to testify on Friday afternoon [March 24, 2000]. It was always my understanding in the scheduling of the events of this case that Dr. Osborne was testifying prior to Dr. Alger so that in the normal course of events—

THE COURT: Almost have to.

[APPELLEES' COUNSEL]:—I would be able to then rebut the allegations. *This is the first that I have heard of his unavailability,* and I think I can say this without it being inappropriate: If it goes as scheduled, Alger first and Osborne second, I am screwed.

(Emphasis added).

Because of Dr. Osborne's absence, the court explored appellants' possible use of the prior testimony of Dr. Osborne, elicited at the first trial in June 1999. The following colloquy is relevant:

THE COURT: Did [Dr. Osborne] testify fully at the prior trial?

[APPELLANTS' COUNSEL]: No, he did not, Your Honor.

THE COURT: It was aborted before he finished his testimony?

[APPELLEES' COUNSEL]: Well, they had finished the direct examination, and I was half way through my cross, at which time we had fully developed the issue that was precipitating the mistrial.

---

commitment with the Pan American Health Organization for over a year for a conference in Central America."

THE COURT: Well, obviously, the reason I ask is, [i]s the prior testimony available for utilization by the plaintiffs in the absence of the witness?

[APPELLEES' COUNSEL]: Yes, and to the extent that it is a full direct examination, then I think we are okay. . . .

THE COURT: Well, I guess the ball is in your court. You say you have got about a half of cross; is that enough? I mean, you covered the issues that you wanted to cover?

[APPELLEES' COUNSEL]: I will have to discuss that with my clients at a recess to determine whether they believe that we can proceed with the status of the cross.

\* \* \*

THE COURT: So if plaintiffs are required to proceed and they do not have the presence-the physical presence of the doctor, then the question will arise whether the use of the deposition is sufficient. . . .

At that point, appellants' lead counsel, Taiwo Agbaje, arrived in court. The following transpired:

THE COURT: A situation has arisen where your co-counsel advised me that Dr. Osborne has, as recently as last night, advised the two of you that he will be out of the country until Sunday.

[APPELLANTS' COUNSEL]: Yes, Your Honor.

THE COURT: That is not acceptable. We can't wait till then, and the question is—and he was scheduled to testify and you were scheduled to finish your case this wee[k].

The question is whether you can work it out with his prior testimony in the earlier case being read in.

[APPELLANTS' COUNSEL]: Your Honor, I, before responding to that, admit a representation to the Court that my case may go until Monday.

THE COURT: Well, it is not going to because of a doctor who you said was arranged to be here tomorrow. Now I don't know whose fault that was that the doctor is not here tomorrow, but it would set us way back and cause us distress.

Now either get the doctor here or proceed by deposition or by prior testimony, if the prior testimony is sufficient. Do you know?

Armstrong informed the court that he was "willing to go with the reading of the prior testimony from the June trial." He also said: "[I]f there is any prejudice in proceedings with the transcript alone, the prejudice is against my clients and not against the plaintiffs." Nevertheless, appellants' counsel complained that, at the first trial, Dr. Osborne testified only as to matters regarding liability, and appellants had intended to elicit additional evidence from him pertaining to damages.

Agbaje also disputed that Dr. Osborne had been scheduled to testify on March 23, 2000, despite what his co-counsel had previously told the court. Agbaje insisted that he had arranged for Dr. Osborne to testify on Friday, March 24, 2000 or Monday, March 27, 2000. After reviewing the record, the court determined that appellants had said they planned to call Dr. Osborne on March 23, 2000.

The court expressed concern about a lengthy delay of the trial if it were to accommodate Dr. Osborne by waiting until March 27, 2000, for his testimony. Nevertheless, it continued to explore the matter, noting appellants' desire while also observing that the testimony of several other witnesses had been scheduled based on the belief that Dr. Osborne would testify on March 23, 2000. The following colloquy is illuminating:

THE COURT: And I don't know that you are even certain of having Dr. Osborne on Monday, are you?

[APPELLANTS' COUNSEL]: We can get him here Monday.

THE COURT: Well, let's assume that happened. That would mean that the defense doctor would have to be put off beyond Dr. Osborne because obviously the defense doctor is testifying in response to Dr. Osborne.

The whole trial was aborted last time to allow counsel to get some doctor to meet this new theory that Dr. Osborne presented, as I understand. Is that correct?

[APPELLANTS' COUNSEL]: Yes.

THE COURT: All right.

[APPELLANTS' COUNSEL]: To meet the theory, but in sequence—

THE COURT: Well, of course. You can't meet it before it is presented, and you see what that would do to our scheduling? We would probably have a down day.

Now you have the testimony of Dr. Osborne from a prior transcript, do you not?

[APPELLANTS' COUNSEL]: We do, Your Honor.

THE COURT: And I have offered you the opportunity to use that, and counsel has agreed that even though you had incomplete cross-examination that he would not interpose an objection to that as opposed to not having the testimony of Dr. Osborne at all, and now you are telling me you want Dr. Osborne here on Monday.

\* \* \*

The prejudice is loss of a full trial day potentially, maybe more.

"[O]ut of a super abundance of caution," the court decided it would permit Dr. Osborne to testify on Monday, March 27, 2000, if appellants' counsel could assure the court the next day of Dr. Osborne's availability on that date. Unfortunately for appellants, Dr. Osborne was not available on March 27, 2000.

During the discussion about delaying Dr. Osborne's testimony until March 27, 2000, Armstrong made a statement to the court that is of significance:

I have to be careful how I do this. *It is no secret to me from January that Dr. Osborne wasn't going to be here this week, no secret to me at all, and that is because of other business contacts that I had with him.*

*I knew in January that he wasn't going to be in town this week. I knew he wasn't even going to be in the country,* and the gall it takes [for appellants' counsel] to come in and represent [that they just found out last night that Dr.

Osborne would be unavailable to testify until Monday] is appalling to me.

(Emphasis added). At that juncture, however, appellants did not complain, protest, or inquire about Armstrong's communications with Dr. Osborne regarding "other business contacts...."

At that point, the court revisited its earlier concern about the failure of appellants' counsel to arrange for Dr. Osborne's presence at trial. The following colloquy ensued:

THE COURT: Well, how could you have possibly—I am going back to the question I asked you before: How could you have possibly made any arrangements with this doctor for his testimony this week if since January Dr. Osborne has known he is not going to be here this week?

[APPELLANTS' COUNSEL]: I sent him a letter every time I have tried this case with him. I have always sent him a letter—

THE COURT: You have had no communication with him, no confirmation of a date?

[APPELLANTS' COUNSEL]: A lot of times I don't call; I just send him a letter. That is how we have always done this, and he has always been very flexible with us—always.

THE COURT: You sent him a letter when? I just asked you if you had a letter to him.

[APPELLANTS' COUNSEL]: I sent him a letter in January—

THE COURT: But you didn't tell him when you expected him to testify; you just told him—

[APPELLANTS' COUNSEL]: No.

THE COURT:—when the case was going to start.

[APPELLANTS' COUNSEL]: I told him the case was March 20 and I will get back in touch with him.

THE COURT: Did you?

[APPELLANTS' COUNSEL]: When I came in, that is when I sent him the e-mail.

THE COURT: When?

[APPELLANTS' COUNSEL]: It was Monday.

THE COURT: Not until Monday?

[APPELLANTS' COUNSEL]: It wasn't until Monday that I sent him an e-mail.

THE COURT: That is just not enough lead time for any expert witness when you are trying to set up scheduling, and we discussed scheduling even last week.

\* \* \* °

[APPELLANTS' COUNSEL]: And again, Your Honor, just to—just for credibility purposes, if I knew that Dr. Osborne was going to be out of the country this week and he knew—

THE COURT: If you had contacted Dr. Osborne, you would have known that.... The failure to contact your expert witness, a failure to make arrangements for his presence on a specific day or days is what has gotten us into this problem, and I have got restless jurors who have got other things to do in their lives.

In a chambers conference the next day, March 23, 2000, appellants' counsel voiced concern about Armstrong's representation of Dr. Osborne in the *Singleton* matter. The court considered the matter "of sufficient import . . . that it ought to be fully on the record." Accordingly, in open court, the judge recounted "part of what was said [in chambers] and then call[ed] upon counsel to flesh out the bones."

For its part, the court noted that Armstrong had intended to delay meeting with Dr. Osborne until the end of the second *Brown* trial in January 2000. But, that trial abruptly and unexpectedly ended before the date that Armstrong had scheduled for the meeting with Dr. Osborne. The court said:

So, it became necessary for Mr. Armstrong to get on with his representation of Dr. Osborne in the D.C. case, and he did so, he says, by making it clear and having an understanding with Dr. Osborne that he would not, could not in any way discuss the aspects of this case with Dr. Osborne while he represented him in Dr. Osborne's case.

The court continued:

The concern of the plaintiffs is that—two-fold, I guess, or maybe three-fold: That the representation of Dr. Osborne by Mr. Armstrong presents an irreconcilable and unwaivable conflict, in that Dr. Osborne, by reason of the ongoing representation of him by Mr. Armstrong, may be biased somewhat, which may affect his testimony, either in substance or in flavor, and that they are concerned that they were not advised of this earlier. . . .

The attorneys are concerned about the appearance of the matter to their clients. So, whether there is a conflict in fact or not, there is the appearance that concerns them.

And finally, I am advised [by appellants' counsel] that they are unable to procure the attendance of Dr. Osborne on Monday [March 27, 2000]. Dr. Osborne is, as we know, out of the country attending a meeting.

And we knew that, but *I said if he could be back here by Monday morning, we would allow them to go, notwithstanding my concerns about their failure to have placed him under subpoena or made any precise arrangements with him for the date of his attendance.*

*I am now advised that he cannot be back here to testify on Monday and that they are simply unable to procure his attendance.*

Now, plaintiffs' counsel have indicated that they are concerned that in some fashion or some manner perhaps Mr. Armstrong's representation of Dr. Osborne has caused or contributed to (a) Dr. Osborne's absence or (b) Dr. Osborne's inability to be back by Monday or reticence to be back by Monday

That is as far as we got. I felt it was sufficiently serious so that we ought to be on [the] record.

I pointed out to counsel that *certainly my initial observation here is that counsel for plaintiff did not make the necessary, prudent, and required arrangements with Dr. Osborne to be present. He is not under subpoena.*

*We have bent over backwards to say that if he could get him here by Monday and if other arrangements could be*

*made for the rebuttal witness or for the defense witness to follow him, that I would reconsider my earlier determination, and indeed I am willing to.*

But now I am told he can't be here, but then that is complicated by the fact of why can't he be here.... And this certainly does pose a problem.

However, my initial inclination is that since they did not take the necessary steps to procure the presence of Dr. Osborne—and although having represented to me that arrangements were made for his attendance on Thursday, they clearly did not.... [N]o arrangements were made either for Thursday or for Monday—specific arrangements, because if so, Dr. Osborne would be here and there would be no problem.

I am not going to wait until Tuesday, Wednesday, Thursday, or Friday of next week for Dr. Osborne. And therefore, it seems to me the solution is that *the plaintiffs, by reason of their own failure to make the necessary arrangements, are going to be required, if they want Dr. Osborne at all, to use the prior sworn testimony of Dr. Osborne [from the first trial].*

They are concerned about that for two reasons. I guess (1) it doesn't have the impact of a live witness, and (2) they claim that had Mr. Armstrong finished his cross-examination, they would have been entitled to redirect.

Well, I am not much impressed by certainly the second argument, because redirect is nothing except meeting new matter that is presented on cross.

And so, theoretically at least and practically, they should have laid forth their entire case to be presented by Dr. Osborne during the direct testimony.

That being the case and *it being the fact that Dr. Osborne indeed gave his prior testimony before there was any sniff of representation of Dr. Osborne by Mr. Armstrong, there can be no bias. There can be no potential for bias in the testimony that Dr. Osborne has already given.*

Accordingly, *it seems to me that a potential problem and a potential conflict that would have required much deeper inquiry is avoided,* perhaps fortuitously, by the developments in this case.

(Emphasis added).

During the ensuing discussion, appellants vigorously complained that they had "been prejudiced by the failure of Mr. Armstrong to notify [them] that he had been in contact with Dr. Osborne" since December 1999. They also claimed that their "expert ha[d] been contaminated." In addition, appellants expressed "concern with regards to the objectivity and the credibility" of Dr. Osborne, claiming that if they had been provided with notice of Armstrong's representation, appellants could have made a decision "as to what [they] wanted to do with Dr. Osborne." Consequently, appellants "mov[ed] the Court for a mistrial," moved to disqualify Armstrong, and asked the court "to grant the plaintiffs an extension of time within which to designate a new expert witness and to grant the plaintiffs a new trial date in this case."

Armstrong explained how he came to represent Dr. Osborne in the *Singleton* matter. Before agreeing to do so, he claimed that he had reviewed the ethics rules but did not perceive a conflict because the *Singleton* case was "a completely unrelated matter in a different jurisdiction." Moreover, he said that he met with Dr. Osborne in the *Singleton* case on only one occasion, and made a genuine effort to avoid contact with Dr. Osborne until the conclusion of the *Brown* trial. He added: "We made very specific arrangements that we would not discuss this case." Armstrong asserted, however, that after the second mistrial in January 2000, he "had to meet" with Dr. Osborne because an answer had to be filed in the *Singleton* case by the end of January 2000.

Further, Armstrong maintained that he learned of Dr. Osborne's plans to be out of the country the week of March 21, 2000, only because the *Singleton* case was scheduled for a status conference on March 24, 2000, and he had inquired of Dr. Osborne as to where he would be on that date, so that he

"could report to him ... what happened." As he saw it, that did not mean that Dr. Osborne would be unavailable for the duration of the trial. Armstrong also observed that Dr. Osborne had already given his opinion in court, *before* Armstrong was ever retained in the *Singleton* case, and his opinion was thus cast "in concrete...."

The court questioned Armstrong about whether he encouraged Dr. Osborne not to appear. The following colloquy is relevant:

THE COURT: Did you in any way procure the absence of Dr. Osborne at this time or encourage it?

[ARMSTRONG]: My understanding from what he told me about the scheduling was that he is from Panama and that he was planning on going to Panama the week of March 21 [st] , and he was going for a conference, and I think he was receiving an award if I remember correctly, and that it had been scheduled for many months.

So, the direct answer is no, but that was the context.

The court also asked:

THE COURT: Did you in any way, you know, encourage him not to cooperate with plaintiffs' counsel in this case?

[ARMSTRONG]: I haven't even discussed that subject.

Appellants' attorney responded that, "knowing what counsel knew, ... as an officer of the court, [Armstrong] had a duty to at least inform the Court that he knew that Dr. Osborne was now going to be away.... It looks like there is an attempt to mislead in this situation. My clients have been seriously prejudiced."

Nevertheless, the court questioned how Dr. Osborne's "earlier testimony could have been in any way contaminated," given that Armstrong did not represent Dr. Osborne in June 1999. In the view of appellants' counsel, the answer to that question required "Dr. Osborne here to tell us exactly when this representation began." The court replied:

Well, I am going to accept [Armstrong's] representation on the record in court that it began in December of

1999.... I mean, if you find out something different at a subsequent time, obviously that is the subject of a post-trial motion. But at this point I am certainly going to accept it for the purposes of making a determination.

Accordingly, the court denied appellants' mistrial motion. In reaching that decision, the court was satisfied that it did not have to resolve the conflict issue, because it concluded that it was the failure of appellants' counsel to make the necessary arrangements to secure the presence of Dr. Osborne at trial that resulted in the expert's unavailability. Moreover, the court was also satisfied that appellants' cause was not completely disadvantaged, because the court agreed to permit appellants to introduce in evidence Dr. Osborne's testimony from the first trial. The court said, in part:

I am going to stick with my original determination in this case, which is reinforced, that *sufficient arrangements were not made—notwithstanding the representations made to me, sufficient arrangements were not made for the presence of Dr. Osborne.* And therefore, I am—and to this date can't be made to have him here in anywhere near time.

\* \* \*

At the very latest, we should finish up the testimony Monday at noon, according to current scheduling, as I gathered. And I am not going to put this case off any longer or drag it or delay it.

And obviously defense counsel would have the right to have their doctor who rebuts Dr. Osborne come after Dr. Osborne. So, that would completely snarl things....

*You didn't make sufficient arrangements. There was not the exercise of ordinary prudence in arranging for the attendance of Dr. Osborne, and you know, you are stuck with that.*

*Now, happily, you are not stuck entirely, because you do have the earlier trial transcript, which I will allow to be used* with a suitable reader and so on. We can work out the details of that.

*And that can't be tainted,* ... I find from information available to me now, *by any subsequent representation of [Dr. Osborne by] Mr. Armstrong.* So, again, somewhat fortuitously, a potential problem is solved.

Now in making that determination, let me make it also clear that if things were different, if Dr. Osborne were coming in here on Monday to testify and you raised this problem with me, I would have to give that a great deal of thought as to whether that potential conflict and the potential for subtle influences on Dr. Osborne would necessitate granting your motion. But that is not the case, and I am not going to tilt at windmills.

*I just don't want the record to show that I am accepting carte blanche the argument of defense counsel that there is no conflict. I am simply finding that I don't have to get into that for other reasons that, as I say, are somewhat fortuitous.*

*Motion for mistrial is denied.*

(Emphasis added).

At the conclusion of the evidence, the court granted appellees' motion for judgment as to the claim of intentional infliction of emotional distress. The case was then submitted to the jury on the remaining claim of negligence. The jury returned a verdict in favor of appellees.

On April 7, 2000, appellants filed a "Motion For New Trial, And For Sanctions," supported by an affidavit of Agbaje. He averred, *inter alia,* that he contacted Dr. Osborne on January 11, 2000, to advise him of the new trial date of March 20, 2000, and the doctor "confirmed that the week of March 20—March 30, 2000 was available for him." Agbaje also said that he wrote to Dr. Osborne on January 16, 2000, "to memorialize the trial date of March 20, 2000," and made other attempts to contact the doctor in February and March 2000.

The court held an evidentiary hearing on May 30, 2000, at which Robert Michael, Esquire, appeared as co-counsel with Armstrong. The evidence included the post-trial testimony of Dr. Osborne, taken on March 29, 2000; transcripts from the

third trial; pleadings from the *Singleton* case, including Armstrong's entry of appearance on January 7, 2000; Agbaje's affidavit; testimony of Armstrong; and testimony of Paul Bekman, Esq., an expert for Armstrong.

Appellants argued, *inter alia,* that, based on their prior relationship with Dr. Osborne, appellants' counsel "never had a reason to subpoena Dr. Osborne." Agbaje asserted: "This is not about me issuing a subpoena to Dr. Osborne . . . ." He maintained that he did not subpoena Dr. Osborne because he considered it "unwise to subpoena your own expert, that it is actually never done . . . ." Moreover, Agbaje reiterated his contention that Armstrong had access to "confidential information" and "strategies" of appellants through appellants' expert. He also attributed the doctor's "unusual behavior" in not responding to his calls to Armstrong's involvement with Dr. Osborne, implying that Armstrong "connived to procure Dr. Osborne's absence." Agbaje conceded, however, that he had no evidence to that effect. Instead, he pointed to the "appearance of impropriety," characterizing Armstrong's conduct as "patently inappropriate" and "grossly unfair," and charging that Armstrong "orchestrated" the expert's failure to appear.

The court responded, as follows:

I indicated that while I might have some concern with the advisability, propriety, what have you of representing a doctor that you knew was going to be involved on the other side as an expert witness in a case, but that under the particular circumstances of this case I didn't feel it necessary to delve too deeply into that because you had not made the necessary arrangements for the presence of the doctor nor had you exercised any prudence or been in contact with the doctor nor had you issued a subpoena for the doctor to be present, and we were going to allow you to use the doctor's deposition, and there was no possibility that that testimony could have been in any way tainted by subsequent representation.

\* \* \*

[I]f you could offer some evidence ... that [Dr. Osborne's] absence had been procured, ... then that would put a different light on it, but what evidence do you have, therefore, that his absence had been procured by Mr. Armstrong?

Mr. Armstrong represented to the Court he had not procured his absence.

\* \* \*

[Y]ou think that inferences can be drawn that somehow Mr. Armstrong procured the absence of this witness for this trial, and I guess I am asking you what evidence you have of that?

The following colloquy ensued:

[APPELLANTS' COUNSEL]: Well, first and foremost, if we review the testimony of Dr. Osborne throughout the course of this trial and, you know, the question that bothers me is how his testimony continued to just change.

Everything just kept changing.

[THE COURT]: Well, now wait a minute. The testimony of Dr. Osborne that was admitted at the trial before the jury ... was taken before the representation of Mr. Armstrong began, was it not?

[APPELLANTS' COUNSEL]: It was taken ... before the representation.

[THE COURT]: So how could that representation have affected that preexisting testimony?

[APPELLANTS' COUNSEL]: Well, that is assuming—that is if we were to assume that this whole collusion began in December.

[THE COURT]: All right. Now what evidence do you have to the contrary?

[APPELLANTS' COUNSEL]: Your Honor, I do not believe that I need to present that evidence to this Court. I think—

[THE COURT]: Well do you have it? I mean, are you holding it in your back pocket?

[APPELLANTS' COUNSEL]: As to—no, I don't, Your Honor, but that is not the inquiry, Your Honor. What we are trying to do here is find direct evidence of their involvement.

It is never going to happen.

[THE COURT]: No, circumstantial evidence can be just as strong as direct sometimes.

[APPELLANTS' COUNSEL]: That is right, and I do have the circumstantial evidence.

[THE COURT]: All right, tell me what it is.

[APPELLANTS' COUNSEL]: Okay. The circumstantial evidence is Dr. Osborne's testimony had started changing from the time—and I did present the Court with the various reports, his deposition testimony and his trial testimony, from the time that we hired him up until the time of the last trial in June. . . .

\* \* \*

Mr. Armstrong should be removed from this case because we believe that he has had confidential information. He . . . knew about our strategy. Everything that was done in this court was orchestrated.

As noted, shortly after the third trial, appellants deposed Dr. Osborne. They introduced his deposition testimony, which included the following:

[APPELLANTS' COUNSEL]: When was the first time that you had contact with Mr. Armstrong?

[DR. OSBORNE]: That was [when] Howard University referred me to Mr. Armstrong because of an unrelated matter just before I left for Caracas, Venezuela. . . . There was no discussion about this case whatsoever. . . .

[APPELLANTS' COUNSEL]: Who initiated the contact, Doctor?

[DR. OSBORNE]: Howard University.

\* \* \*

[APPELLANTS' COUNSEL]: Did you have any telephone discussion with Mr. Armstrong?

[DR. OSBORNE]: I'm sure I did only to be notified that Howard has appointed him to represent me in the case against Howard.

[APPELLANTS' COUNSEL]: When was that, Doctor?

[DR. OSBORNE]: Oh, that was just before leaving for Venezuela. I don't remember the exact date. It must have been February 25th or thereabouts.

[APPELLANTS' COUNSEL]: Prior to February 2000, have you had any contact with Mr. Armstrong?

[DR. OSBORNE]: Only in court [with respect to the *Brown* matter].

\* \* \*

[APPELLANTS' COUNSEL]: Did Mr. Armstrong advise you that—to inform the plaintiffs and their counsel of his potential representation?

[DR. OSBORNE]: I think he mentioned that we should talk about it. . . .

\* \* \*

[DR. OSBORNE]: He asked me if I had any problem, if I foresaw any conflict with this. I said no, I will testify what I have to testify in court regardless of who I am appointed to, it would have absolutely no bearing whatsoever on my testimony [in the *Brown* case], and I haven't gotten in contact with him since then.

\* \* \*

[APPELLANTS' COUNSEL]: Have you met Mr. Armstrong in person?

[DR. OSBORNE]: Yes, I have.

\* \* \*

[APPELLANTS' COUNSEL]: When did you meet with him?

[DR. OSBORNE]: Just before leaving [the country]. I don't remember the exact date. . . .

[APPELLANTS' COUNSEL]: That was sometime in February?

[DR. OSBORNE]: Late February.

* * *

[APPELLANTS' COUNSEL]: What was the nature of the meeting?

[DR. OSBORNE]: Just to discuss what the [*Singleton*] case was all about, what involvement I had with the patient. . . .

*[APPELLANTS' COUNSEL]: Now, the trip to Panama, when was it planned?*

*[DR. OSBORNE]: Oh, it was planned months in advance. I don't know if I have the program here. It's over a year ago.*

* * *

[APPELLANTS' COUNSEL]: Did Mr. Armstrong have your telephone number [in Panama]?

[DR. OSBORNE]: No. . . .

* * *

[APPELLANTS' COUNSEL]: Doctor, before today have you advised the plaintiff of your role with Kenneth Armstrong, before this testimony that you are giving, have you ever contacted the plaintiffs about your involvement with Mr. Armstrong?

[DR. OSBORNE]: No.

[APPELLANTS' COUNSEL]: So if I didn't bring this up, Doctor, there's no way we would have known, correct?

[DR. OSBORNE]: Well, I don't know if there is any way.

[APPELLANTS' COUNSEL]: But it would not have come from you?

[DR. OSBORNE]: Not from me, no.

(Emphasis added).

Armstrong recounted the chronology of his representation of Dr. Osborne, explaining that Howard Hospital first contacted him in late December 1999. Thereafter, on January 5, 2000, Armstrong talked to Dr. Osborne for the first time, and told him that he wanted to meet after completion of the *Brown* trial, which was scheduled to begin January 10, 2000. He also maintained that he promptly invoked the principles of a "Chi-

nese wall," and advised Dr. Osborne that he "would not be discussing the Brown case with [Dr. Osborne] at any time...." Further, Armstrong testified that he "left it to [Dr. Osborne] to contact Mr. Agbaje if he wished to do so, about [Armstrong's] representation [of him] in the *Singleton* case," because he thought that was the "best" way to proceed. In his view, any conflict was Dr. Osborne's, not his. He said:

> I did not believe once I had created the information or wall, as it has been phrased, a Chinese wall, that I had a separate obligation to contact Mr. Agbaje to advise him.

> I believed that was—with the attorney/client privilege particularly at that stage, it was for Mr.—or for Dr. Osborne to waive the privilege and discuss it directly with—with counsel.

The following testimony of Armstrong is also pertinent.

[COUNSEL FOR APPELLEES]: And can you tell us, sir, [a]t any time after you commenced representation of Dr. Osborne in the *Singleton* matter, had you at any time, either orally, in writing, directly, indirectly, discussed with him any aspect of the Brown case?

[ARMSTRONG]: No.

[COUNSEL FOR APPELLEES]: Does that also include his availability for trial—

[ARMSTRONG]: Yes.

[COUNSEL FOR APPELLEES]:—in March of the Year 2000?

[ARMSTRONG]: Yes, it does.

\* \* \*

[COUNSEL FOR APPELLEES]: And did you make any effort at any time, either before trial or during trial to find out from Dr. Osborne or his staff or have a member of your staff try to find out information about whether he was actually coming to this trial or not?

[ARMSTRONG]: I made no attempt to make any such contact or to determine that at all.

[COUNSEL FOR APPELLEES]: And did you, Mr. Armstrong, do anything, either directly or indirectly, to cause, influence or in any way have Dr. Osborne not be present for trial in the Brown matter in March of the Year 2000?

[ARMSTRONG]: I did nothing other than what is reflected in my letter of January 6th, which is to advise him I would not discuss it and leave it up to him to discuss it with Mr. Agbaje.

\* \* \*

I have had no other oral or written contact about the Brown case with him at all.

When asked why Armstrong told the court during the third trial that it was the first time he had heard of Dr. Osborne's unavailability, Armstrong explained:

I had had no contact with [Dr. Osborne] about the appearance at trial. I assumed that arrangements had been made to bring him back and have him testify at trial.

The following testimony is also pertinent:

[COUNSEL FOR APPELLEES]: Can you tell me, sir, [w]ere you aware before March of 2000 from your contact with Dr. Osborne that he was not going to be or at least his plans were not to be in town at the time of the trial of the Brown matter?

[ARMSTRONG]: I knew that he had plans to be in Panama the week of March 21st, but that doesn't mean that I knew that he had plans not [to] be in town for the trial.

The trial was scheduled for 10 days, and I did not know what arrangements had been made with Mr. Agbaje for his presence.

\* \* \*

The information that I had had was that he was going to be in Panama the week of March 21st. When counsel indicated that he was going to bring him back, I assumed that other arrangements had been made, and I assumed that they were going to then produce him as they had promised on Thursday, March 23rd.

[COUNSEL FOR APPELLEES]: And can you tell me, Mr. Armstrong, [u]p until the discussion that was had before Judge McAuliffe on the morning of March 22, 2000, were you aware in any way, shape or form, through either direct or indirect information of any kind that Dr. Osborne was not going to be in attendance physically and personally at the Brown trial?

[ARMSTRONG]: No.

Paul Bekman, Esquire, who testified as an expert for Armstrong, opined that Armstrong complied with his "professional and ethical obligations" in regard to Dr. Osborne. Bekman noted that the propriety of contact between an attorney and an expert for an opposing party "depends upon the facts and the particular circumstances of the case. . . ." Bekman opined: "I think [Armstrong] acted totally appropriately when he contacted [Dr. Osborne]. . . ." In Bekman's view, it was significant that Dr. Osborne had "committed himself to his testimony in June of 1999 . . .", before Howard Hospital ever retained Armstrong. He also considered it noteworthy that Armstrong had not sought out Dr. Osborne.

Additionally, Bekman deemed it significant that Armstrong was never put in the position of having to cross-examine Dr. Osborne. Moreover, Bekman suggested that it was Dr. Osborne who may have had the conflict. He stated:

I believe it is Dr. Osborne's call here as to whether there is a conflict, and I think that was made very clear in Mr. Armstrong's letter to him.

Let's say that Mr. Armstrong had met with Dr. Osborne and was going to cross-examine him at the time of trial, and Dr. Osborne, in connection with the *Singleton* case, gave Mr. Armstrong confidential information about his background; for example, that he had been denied privileges or his privileges had been suspended at a hospital for some conduct.

That would be information that Mr. Armstrong would have garnered during the course of his professional relationship with Dr. Osborne which he would not otherwise have

learned, and for him to then take that and use it in the *Brown* case would be improper, and that is why, under those circumstances, had that situation arose, it would have been improper, but as I have indicated and as the facts in this case have shown, there was no taint because the testimony that was used was the June 1999 testimony, and Mr. Armstrong never cross-examined Dr. Osborne after he was appointed to his representation.

On the other hand, Bekman was critical of the failure of appellants' counsel to subpoena Dr. Osborne. Although "Mr. Agbaje ... candidly admitted that he did not subpoena Dr. Osborne ....," Bekman said that, by custom and practice, and for the protection of both the lawyer and the doctor, a lawyer should subpoena a physician whose testimony is needed for trial. He explained:

[T]he physicians and experts who testify are extremely busy and their calendars are extremely busy, so it's critical to map out when someone is going to testify during a trial.

The court does not want any down time; the court wants to move the case along, and the parties and everyone is entitled to do so.

So the specific time and date is going to be determined well in advance because the physician or expert has to make arrangements within their schedule when they can come in.

So you have got to give them as much advance notice as is possible, and they are going to want to know not just a week ahead of time; they're going to want to know as much as a month or more ahead of time when they're going to be able to come in.

The court carefully considered the circumstances of the case and the evidence. It was "persuaded" that "the so-called Chinese wall was effectively erected; that is, one was put in place immediately ..." by Armstrong. Although the court was satisfied that "no information was exchanged or obtained with respect to the Brown case ...," it was also mindful of the potential "subliminal effect" of Armstrong's representation of Dr. Osborne. The court reasoned:

The problem ... perhaps transcends [the Chinese wall]. The problem is in the existence of a lawyer/client confidential relationship and its potentially subtle ... effect on Dr. Osborne's later testimony.... It is not always possible to fully understand how the representation of an expert in a separate case, by the very lawyer opposing the party who retained the expert in another case, may impact on you whether you want it to impact on you or not.

Thus, the court acknowledged a "lingering concern about the representation of the opposing expert even under the circumstances that occurred here." It also had a "lingering concern about Mr. Armstrong's obligation, if any, to say something to Mr. Agbaje about this so that if there was a problem that required the court's attention before the case came to trial, it might have been fully litigated then...."

Ultimately, however, the court again determined that, in the context of this case, any conflict or impropriety of Armstrong was of no consequence, because it was the conduct of appellants in failing to arrange for Dr. Osborne's appearance at trial that led to his unavailability. The court reasoned that there were two possible grounds that would alter the significance of appellants' failure to arrange for Dr. Osborne's appearance at trial:

[I]f there is harm, there is no foul unless one of two things is present.

If Mr. Armstrong procured the absence of Dr. Osborne or counseled Dr. Osborne as to non-availability or non-communication with plaintiff's counsel, that would be a different matter because that then would affect why Dr. Osborne was not there.

The second possibility that could change my mind would be if Mr. Armstrong had some contact with Dr. Osborne apart from normal and appropriate contact dealing with this Brown case before Dr. Osborne's deposition and testimony became of record.

The court was readily satisfied that neither circumstance outlined above occurred. Therefore, it did not consider it

necessary to determine whether Armstrong committed any ethical violation. The court stated:

I find without difficulty that neither of those two contingencies occurred. Mr. Armstrong did not procure the absence of Dr. Osborne nor did he counsel him about non-availability or non-communication with plaintiff's counsel.

Mr. Armstrong, furthermore, had no contact outside of the normal expected contact in this case with Dr. Osborne before Dr. Osborne's deposition and testimony were taken.

So what I opined at the time I think continues to be true, that I need not determine here whether there was a violation of an ethical standard.

I have admitted to having some lingering concern for the reasons I have expressed, but it doesn't matter in the context of this case.

The ruling that I made was a ruling that had to do with whether Dr. Osborne—whether there had been any prudent steps to procure his presence, and actually his deposition was ultimately used.

The court also concluded that the use at the third trial of Dr. Osborne's testimony from the first trial was due solely to appellants' failure to subpoena Dr. Osborne. Because that testimony was elicited in June 1999, months before Armstrong ever began to represent Dr. Osborne in the *Singleton* case, the court found that the June 1999 testimony could not have been tainted by any conflict of interest. The court explained:

[H]ere, as I pointed out at trial, the determination of whether there was anything that was in violation of ethical standards turns out not to be critical because I found then and I was absolutely correct, in my opinion, that plaintiffs' counsel had made no appropriate arrangements for the appearance of Dr. Osborne, had not subpoenaed Dr. Osborne, had not made sufficient pre-trial efforts to locate him.

At one point I was told by co-counsel for Mr. Agbaje that yes, the arrangements had been made, the doctor would be there, and a specific date was given.

Now that turned out to be or at least it was represented to me to be a misunderstanding between counsel and that co-counsel had made a representation that he had no right to make.

He understood it one way, but it was not that way because in fact counsel for the plaintiffs had not been in touch with Dr. Osborne to make the arrangements, and I had made it very clear before any of this really came into full bloom that they were going to have to go with the deposition or lose the testimony of the doctor entirely.

As it turned out, they did go with the deposition, and so the fact that there was a subsequent representation, even if it may have offended any ethical standards, is of no import to me in connection with whether this trial was fair.

Plaintiffs were appropriately, in my opinion, relegated to the use of Dr. Osborne's testimony....

Accordingly, the court ruled:

So I find there [are] no grounds for the granting of a mistrial.... I deny that.

There was a motion for sanctions. I deny that. There is a motion for new trial, and I deny that....

We shall include additional facts in our discussion.

## DISCUSSION[5]

### I.

■ Appellants contend that the court erred in failing to grant either a mistrial or a new trial as a result of Arm-

---

5. We note that the Hospital and the two nurses have submitted a joint brief, in which they point out that, on appeal, appellants have not challenged the court's entry of summary judgment in their favor. Therefore, they contend that the propriety of the court's grant of summary judgment in their favor is not before us. We agree. *See Harrison v. Harrison*, 109 Md.App. 652, 673–74, 675 A.2d 1003 (stating that, "[g]enerally, we shall not decide issues that have not been raised"), *cert. denied*, 343 Md. 564, 683 A.2d 177 (1996); *DeGroft v. Lancaster Silo Co.*, 72 Md.App. 154, 159, 527 A.2d 1316 (1987) (stating that we will not "address the question of the propriety of the grant of

strong's representation of Dr. Osborne in the *Singleton* case. They argue that Armstrong's representation of Dr. Osborne in the *Singleton* matter during the pendency of the *Brown* case, and his *ex parte* communications with Dr. Osborne, "deprived appellants of a fair trial," amounted to "witness tampering," and constituted "misconduct prejudicial to the administration of justice." Indeed, appellants assert that the relationship between Armstrong and Dr. Osborne "reeks of bias, impropriety and it stinks to the high heavens."

In particular, appellants maintain that, "[b]y his unsupervised access to Osborne on more than two occasions, Armstrong violate[d] Rule 8.4(d) of the Rules of Professional Conduct." Rule 8.4(d) provides: "It is professional misconduct for a lawyer to ... engage in conduct that is prejudicial to the administration of justice." Appellants also contend that "Armstrong's attempts to mislead the Trial Court by stating that he was just hearing of Osborne's unavailability on March 22, 2000 is professional misconduct which violates Rule 8.4(c), which prohibits a lawyer's engagement in conduct involving dishonesty, fraud, deceit or misrepresentation." Therefore, appellants contend that the trial court erred in concluding that they were not prejudiced by Armstrong's relationship with Dr. Osborne.

Appellees raise several arguments in opposition to appellants' claims. They point out that Dr. Osborne's absence at trial was the result of the failure of appellants' counsel "to secure his attendance" by subpoena. Moreover, they maintain that appellants were not prejudiced because the court allowed them to offer the testimony of Dr. Osborne, adduced at the first trial in June 1999, which "preceded any relationship with Mr. Armstrong, thereby removing any possible taint or prejudice." In addition, appellees observe that appellants never

---

summary judgment ... for the simple reason that appellant did not present or argue the issue in his brief."); *see also* Md. Rule 8–504(a)(5) (stating that an appellate brief "shall ... include ... [a]rgument in support of the party's position.").

objected to the use of Dr. Osborne's trial testimony of June 9, 1999.

At the outset, because appellants' challenge is raised in the context of the court's failure to grant a mistrial or a new trial, we pause to review the standards that govern our review.

 " ' "The declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice." ' " *Hill v. State,* 134 Md.App. 327, 348–49, 759 A.2d 1164 (citations omitted), *cert. denied,* 362 Md. 188, 763 A.2d 735 (2000); *see Hunt v. State,* 321 Md. 387, 422, 583 A.2d 218 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991). " 'The question is one of prejudice.' " *ACandS, Inc. v. Godwin,* 340 Md. 334, 407, 667 A.2d 116 (1995) (citation omitted); *see Carter v. State,* 366 Md. 574, 589, 785 A.2d 348 (2001). "Whether to order a mistrial lies in the sound discretion of the trial judge, and appellate review of the denial of the motion is limited to whether there has been an abuse of discretion." *Godwin,* 340 Md. at 407, 667 A.2d 116; *see Klauenberg v. State,* 355 Md. 528, 555, 735 A.2d 1061 (1999); *Medical Mut. Liab. Ins. Soc'y v. Evans,* 330 Md. 1, 19, 622 A.2d 103 (1993).

 Maryland Rule 2–533 permits a party to seek a new trial upon a timely motion founded on proper grounds. *See Thodos v. Bland,* 75 Md.App. 700, 706, 542 A.2d 1307, *cert. denied,* 313 Md. 689, 548 A.2d 128 (1988). As the Court of Appeals recently made clear, the denial of a motion for new trial is reviewable on appeal and, ordinarily, "discretionary rulings on such motions are subject to reversal where there is an abuse of discretion." *Merritt v. State,* 367 Md. 17, 28, 785 A.2d 756 (2001); *see Buck v. Cam's Broadloom Rugs, Inc.,* 328 Md. 51, 56–7, 612 A.2d 1294 (1992). But, in *Merritt,* the Court also recognized that a ruling on a motion for new trial is sometimes reviewed under an error standard. The Court said: "Consistent with the recognition in *Buck* that sometimes a trial court has virtually no discretion to deny a new trial motion, we have taken the position that some denials of new trial motions are reviewable under a standard of whether the

court erred rather than under an abuse of discretion standard." *Merritt,* 367 Md. at 30–31, 785 A.2d 756. Moreover, the Court explained that, when an alleged error occurs during trial and is not discovered, without fault, during the trial, the denial of a new trial motion is reviewed "under a standard of whether the denial was erroneous." *Id.*

In this case, on March 23, 2000, and again on May 30, 2000, the court fully heard the issues spawned by Armstrong's representation of Dr. Osborne in the unrelated malpractice case. As we have seen, the evidence and proffers showed that Howard Hospital contacted Armstrong about an unrelated matter. He intended to meet with Dr. Osborne in late January 2000, after the conclusion of the second *Brown* trial. Because it ended in a mistrial, however, Armstrong proceeded with the meeting that had been previously scheduled. In doing so, the court found that Armstrong quickly erected a "Chinese wall," and never exchanged confidential information or discussed any aspect of the *Brown* case with Dr. Osborne. Significantly, the court was also satisfied that Armstrong did not procure Dr. Osborne's absence at the *Brown* trial, or suggest to him that he should not cooperate with appellants. Indeed, the court explicitly found: "Mr. Armstrong did not procure the absence of Dr. Osborne nor did he counsel him about non-availability or non-communication with plaintiff's counsel."

To be sure, the court acknowledged "lingering" concerns as to the propriety of Armstrong's conduct and the possible "subliminal" influences on Dr. Osborne as a result of Armstrong's representation of him. But, it concluded that the misconduct, if any, was of no legal significance, because Dr. Osborne's absence at trial was the result of appellants' own dereliction in failing to exercise "ordinary prudence in arranging for [his] attendance." Therefore, the trial judge concluded that it was not necessary to determine "whether there was a violation of an ethical standard" by Armstrong. As a result of that ruling, appellants introduced in evidence Dr. Osborne's untainted testimony from the first trial.

 We apply the clearly erroneous standard to the lower court's numerous findings of fact. Rule 8–131(c); *see Gregg Neck Yacht Club, Inc. v. County Comm'rs of Kent County,* 137 Md.App. 732, 751–52, 769 A.2d 982 (2001). "The clearly erroneous standard requires an appellate court to consider the evidence produced at trial in a light most favorable to the prevailing party." *Murphy v. 24th Street Cadillac Corp.,* 353 Md. 480, 497, 727 A.2d 915 (1999). "A trial court's findings are clearly erroneous when they are not supported by substantial evidence." *Gregg Neck,* 137 Md.App. at 752, 769 A.2d 982. In our view, the court's factual findings, including that Armstrong erected a Chinese wall, did not procure Dr. Osborne's absence, and did not induce him not to cooperate with appellants, were not clearly erroneous. We also completely agree with the court that Dr. Osborne's testimony from June 1999 was not tainted by Armstrong's representation of Dr. Osborne, because that representation did not begin until some six months later.

We are equally satisfied that the court was legally and factually correct in finding that Dr. Osborne was unavailable due to appellants' conduct. This Court has stated:

"When an expert to support the litigant's position is found, it behooves counsel to consult with the expert witness to review the facts, examine the record and discuss the theory of the claim or a defense of the client. At the same time, it is the responsibility of trial counsel to discuss fees for consultations, review of opposing experts' opinions and voluntary attendance at trial. If the expert is beyond the jurisdiction of the court to compel attendance at trial, it is the responsibility of the party offering the expert to ascertain the willingness and availability of the expert to appear at trial. The proponent of the expert must attempt to arrange a trial date at which the expert can appear. *Since the expert is under the control of the offering litigant, due diligence must be used to secure the attendance of the witness at trial.*"

*Myers v. Estate of Alessi,* 80 Md.App. 124, 140, 560 A.2d 59, *cert. denied,* 317 Md. at 641, 566 A.2d 101 (1989) (emphasis added) (citation omitted).

With respect to the alleged conflict of interest, we note that in our review of the Maryland Rules of Professional Conduct, we have not found a provision that specifically governs the circumstances of this case. Rule 1.7 and Rule 1.8, for example, pertain to conflicts of interest, but do not apply here. To illustrate, Rule 1.7(a) generally bars an attorney from representing a client if the representation would be "adverse to another client." Rule 3.4(a), which prohibits a lawyer from "obstruct[ing] another party's access to evidence ... [or] counsel[ing] or assist[ing] another person to do any such act," would have general applicability, but the court expressly found no such conduct by Armstrong.

 Even if Armstrong had a conflict of interest with regard to his representation of Dr. Osborne, a conflict alone does not compel us to reverse. Analogizing this case to a claim of conflict of interest by a defense attorney in a criminal case, we believe that a finding of conflict is but "the first step in determining" whether a mistrial or a new trial is warranted. *See United States v. Schwarz,* 283 F.3d 76, 92 (2nd Cir., 2002)(concluding that defendant's trial attorney had conflict of interest in representing defendant in police brutality case, because he also represented police association; therefore, defendant was denied constitutional right to counsel). Indeed, the Second Circuit recently acknowledged that a new trial is warranted when the conflict "adversely affect[s]" the lawyer's performance. *Id.* In much the same way, we have looked here for some evidence that the alleged conflict adversely affected the expert's performance. That issue never materialized, however, because appellants never secured the expert's attendance at trial, and there was no finding or evidence that Armstrong somehow corrupted the expert to induce him not to appear.

Appellants rely on *Erickson v. Newmar Corp.,* 87 F.3d 298 (9th Cir.1996), to support their contentions. In that case,

Donald Erickson, who was *pro se*, brought suit against Newmar Corporation, claiming that his motor home, manufactured by Newmar, was defective. Before a scheduled deposition of Erickson's metal expert, Newmar's attorney sought to hire the plaintiff's expert to evaluate a lock for an unrelated case. The plaintiff was present during the conversation, and when the defense lawyer asked him if he had a problem with the arrangement, he said that it was not his decision. *Id.* at 300. Subsequently, the plaintiff told the attorney that she had "violated the law." *Id.*

Erickson filed a "Motion for Judgment Against Newmar for Tampering with a Material Witness," *id.*, which the court denied. That same day, after the expert resigned from his role with defense counsel in the unrelated case, Erickson fired the expert, claiming a lack of trust. In addition, Erickson's other expert witness refused to testify, because "he did not want to be involved in a case where 'the attorneys [were] bothering the witnesses.'" *Id.* Consequently, Erickson went to trial without his expert witnesses, and the court entered judgment in favor of Newmar.

On appeal, the Ninth Circuit framed its inquiry as follows: "[P]laintiff's claim of unethical conduct by defense counsel requires us to decide: 1) whether [the defense] attorney['s] offer of employment and subsequent ex parte communication with [the plaintiff's expert] was unethical; and 2) if so, what sanction is appropriate?" *Id.* at 301. The court ruled that the trial court "abused its discretion by failing to address Erickson's claim of unethical conduct in the form of witness tampering." *Id.* at 303. Consequently, the court reversed the judgment of the district court, remanded the matter for a new trial, and instructed the trial court to impose appropriate sanctions upon the defense attorney. *Id.* at 304.

The court acknowledged that "[t]here is a scarcity of case law on the issue of ex parte contact with expert witnesses, possibly because the violation seldom happens." *Id.* at 302. Nonetheless, citing American Bar Association Formal Ethics Opinion 93–378 (1993), and the Oregon State Bar Association's

Formal Opinion 1992–132 (1992), the court stated that "an attorney violates an ethical duty when the attorney has ex parte contact with the opposing party's expert witness." *Id.* The court reasoned that, "[r]egardless of [the defense attorney's] motive, at a minimum, the offer of employment put [the plaintiff's expert] in the position of having divided loyalties. Quite simply, this court chooses to abide by the ageless wisdom that a person cannot serve two masters." *Id.* at 303.

We agree with appellees that *Erickson* is distinguishable from this case. We explain.

In *Erickson*, the communications between the plaintiff's expert and the opposing counsel preceded the deposition of the plaintiff's expert. In contrast, Armstrong and Dr. Osborne had no contact until after Dr. Osborne had testified at the first trial in June 1999; due to the failure of appellants' lawyers to secure Dr. Osborne's presence at the third trial, that was the testimony that was introduced at the third trial. Clearly, that testimony was not tainted by Armstrong's representation of Dr. Osborne. Put another way, Dr. Osborne could not have been influenced in regard to his testimony, even subliminally, because his testimony was provided *prior to Armstrong's representation of him.*

To be sure, it is unfortunate that Dr. Osborne did not see fit to respond to the efforts of appellants' counsel to contact him, so as to advise appellants' lawyers of his scheduling difficulty. On the other hand, he never affirmatively represented that he would be present at the June trial, and therefore appellants did not rely on any such representation. In short, Dr. Osborne neither misled appellants' attorneys nor induced them not to issue a subpoena for his attendance.

Moreover, although Armstrong knew that Dr. Osborne would be out of the country during the week of March 20, 2000, there was no evidence that Armstrong encouraged or directed Dr. Osborne to leave the country at the time of the third trial, or to withhold such information from appellants. Further, although Armstrong was aware of Dr. Osborne's unavailability, there was no evidence that appellants lacked

such knowledge, or that he was aware that Dr. Osborne was unavailable for the entire trial. While not dispositive, we also observe that in *Erickson* it was the attorney who solicited the opposition's expert, while here it was the expert's employer who solicited the opposing attorney in an unrelated case.

We recognize that Armstrong might have found himself in an uncomfortable position had Dr. Osborne been present at the third trial, and we do not commend his decision to leave it to Dr. Osborne to disclose to appellants that Armstrong had been retained to represent Dr. Osborne in the *Singleton* case. Dr. Osborne, who is not an attorney, may not have appreciated the possible implications of the situation. Appellants' eleventh hour discovery of that representation injected an issue in the case that was completely avoidable.

Nevertheless, even if it was improper for Armstrong to have represented Dr. Osborne during the pendency of the *Brown* case, and even if he should have disclosed to appellants his representation of Dr. Osborne in the *Singleton* matter, such conduct ultimately had no bearing on Dr. Osborne's failure to appear at trial. Put another way, any impropriety or conflict was not the proximate cause of appellants' fundamental problem. Rather, the problem resulted from the unavailability of Dr. Osborne, and it was a problem of appellants' own making. Given the attendant circumstances, we conclude that the trial court neither erred nor abused its discretion in denying appellants' motions for mistrial and new trial.

## II.

Appellants complain that, during the third trial, appellees' expert witness, Lindsay Alger, M.D., improperly and unfairly offered new opinion testimony concerning gram negative rods and E. coli, without providing appellants with notice of these opinions. Therefore, they maintain that they were unable to prepare for them. Appellants also observe that, at the first trial in June 1999, when appellees alleged that Dr. Osborne offered an opinion that had not been disclosed, the court granted appellees' mistrial motion. In a "good for the goose,

good for the gander" argument, appellants suggest they were entitled to the same relief when they sought a mistrial at the third trial. Appellants add that they were prejudiced by the absence of Dr. Osborne at the third trial, because it was "impossible" for them "to rebut any new testimony . . .," that Dr. Osborne's prior testimony did not address. Consequently, appellants argue that the trial court erred in denying their motions for mistrial or new trial.[6]

Appellees argue that, for several reasons, appellants have waived their objection to the admissibility of evidence regarding gram-negative rods and E.coli. First, they contend that Lewis Townsend, M.D., who was identified in appellees' "Preliminary Identification of Expert Witness" as a board certified obstetrician/gynecologist, testified prior to Dr. Alger and expressed the same opinion as Dr. Alger, without objection. In addition, appellees maintain that appellants pursued this issue by eliciting like evidence through their witness, Dr. Anthony Scialli. Appellees also assert that it was appellants who elicited the testimony on cross-examination. Further, appellees argue that "[a]ppellants' assertions on this issue were not preserved by raising them for the first time, in a motion for new trial."

We agree with appellees that the issue of the propriety of Dr. Alger's testimony has not been properly preserved. Nor is the issue of surprise supported by the record.

 The record reflects that, on March 24, 2000, Dr. Townsend, a defense expert, expressed an opinion similar to Dr. Alger's, without objection from appellants' counsel. The following testimony is relevant:

[APPELLEES' COUNSEL]: Now, have you learned from your review of the records anything about the condition of the child at the time of the autopsy?

---

**6.** Appellants devote less than two pages to this issue, and have not cited any authority to support their argument.

[DR. TOWNSEND]: Well, the condition of the child from the pathology report from Holy Cross demonstrated several things.

No. 1, there was—seemed to be an acute infection of the placenta, the cord, as well as the baby. There were some— within the embryo itself, there were signs of infection.

\* \* \*

And looking forward in those records, it appeared that *the infection was caused by a gram-negative rod organism,* which is a particular organism that we find not uncommonly in the female genital tract and can cause infections in the uterus.

[APPELLEES' COUNSEL]: *And what is that common gram-negative rod organism?*

[DR. TOWNSEND]: *It could be an E. coli,* which comes from the bowel area and certainly is colonized in a lot of patients' vaginal-cervical areas.

[APPELLEES' COUNSEL]: That is all the questions I have.

(Emphasis added).

Moreover, in reviewing Dr. Alger's testimony at the third trial, we are unable to find any place where appellants' counsel objected to the testimony regarding gram-negative rods and E. coli. The following testimony is illustrative:

[APPELLEES' COUNSEL]: Is there any way for you to determine where the infection of the placenta and the fetus came from or comes from?

[DR. ALGER]: Well, we know that the bacteria that they wrote in the—I think there was a culture that was done. I can't remember what it was, but I know there's a report that says enteric—

[APPELLEES' COUNSEL]: Yes.

[DR. ALGER]:—gram-negative rods.

[APPELLEES' COUNSEL]: Yes. . . .

[DR. ALGER]: *Let's see. Where is that coming from? There is—the placenta was cultured after the delivery, and*

*what it showed was many and a pure growth of gram-negative rods (enteric).*

*And what that normally would mean is that this is E. coli. Escherichia coli is the bacteria—*

[APPELLEES' COUNSEL]: *And where does E. coli come from?*

[DR. ALGER]: *And that comes from the gut, the intestines. And it's very common, because the vagina is close to the anal orifice, to have E. coli get inside the vagina. This is one of the most common pathogens.*

*When you have somebody who has this kind of single organism grow out, usually it is E. coli, or it can be Group E strep. Group E strep doesn't look anything like this— little cocci.*

*And the fact that it says "enteric" means that it's coming from the gut. And when you have bacterial vaginosis, for example, Gardnerella is not an enteric organism.*

*So, that wasn't what they were finding in the placenta. What they were finding was E. coli. And that's been associated many times with preterm birth.*

On recross, the following occurred:

[APPELLANTS' COUNSEL]: Okay. [At your deposition,] I had asked you what was the cause of infection, and you said you didn't even know the cause of infection. Do you remember that?

[DR. ALGER]: Yeah. *I don't know why the E. coli got up there.*

\* \* \*

[APPELLANTS' COUNSEL]: *So, when did you find out that it was E. coli?*

[DR. ALGER]: *We're talking about two different things. I'm not saying E. coli caused this preterm labor. I'm saying that what was cultured from the placenta is an*

*enteric gram-negative rod—greater than 50–percent probability that that would be E. coli. . . .*

(Emphasis added).

In addition, Anthony Scialli, M.D., a board certified obstetrician/gynecologist, testified as an expert for appellants on March 27, 2000, three days after Dr. Alger. He, too, gave testimony as to a bacterial infection, as follows:

[APPELLANTS' COUNSEL]: Doctor, when you reviewed the pathology report that was done sometime after May 13, 1994, did you make a determination as to the cause of the infection?

[DR. SCIALLI]: I saw there was evidence of infection in the placenta, in the membranes, in the baby; but as to the organism causing the infection, I can't tell you what that is, except to say *that it appears to be a gram-negative rod.*

\* \* \*

[APPELLANTS' COUNSEL]: Now, Doctor, did you render an opinion in this case previously with regard to the cause of infection?

[DR. SCIALLI]: I did.

[APPELLANTS' COUNSEL]: What was that opinion, Doctor?

[DR. SCIALLI]: There was testimony in which I said that the infection was caused by an organism called lyseria [ph].

[APPELLANTS' COUNSEL]: Doctor, what was the basis for that opinion?

[DR. SCIALLI]: I read a pathology report that, as I read it, said that there was lyseria [ph].

\* \* \*

[APPELLANTS' COUNSEL]: And can you read that report for the members of the jury?

[DR. SCIALLI]: I don't think you want me to read every word, but the pertinent parts are: *many and pure growth of gram-negative rod,* enteric, sensitivity upon request. . . .

\* \* \*

[APPELLANTS' COUNSEL]: *Now, prior to today, have you ever rendered an opinion as to E. coli being the cause of infection in this case?*

[DR. SCIALLI]: *Not that I recall.*

 * * *

[APPELLANTS' COUNSEL]: In fact, you reviewed that report very well the last time, correct?

[DR. SCIALLI]: Yes.

[APPELLANTS' COUNSEL]: *And you had no opinion that E. coli was the cause of the infection, correct?*

[DR. SCIALLI]: *That's correct.*

(Emphasis added).

Ordinarily, if an argument is not raised below, it is not preserved for appellate review. *See* Maryland Rule 8–131(a). The Court of Appeals "has stated that the 'primary purpose of Rule 8–131(a) is " 'to ensure fairness for all parties in a case and to promote the orderly administration of law.' " ' *Davis v. DiPino,* 337 Md. 642, 647, 655 A.2d 401 (1995) (citations omitted). "Providing fairness to the parties may be accomplished by 'requir[ing] counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings.' " *Id.* (quoting *Clayman v. Prince George's Co.,* 266 Md. 409, 416, 292 A.2d 689 (1972) (alteration in original)).

 Although appellants raised the issue in their motion for new trial, they did not object to Dr. Alger's testimony at trial. A party who does not raise an issue at trial, and later pursues the point in a post-trial motion, is precluded from raising the substantive issue on appeal. *See Anderson v. Litzenberg,* 115 Md.App. 549, 578–79, 694 A.2d 150 (1997)(stating that although "a trial court may grant a new trial on the basis of an issue that could have been, but was not, raised at trial," when "the trial court denies such a motion, ... the movant is precluded from raising those substantive issues on appeal."); *see also Buck v. Cam's Broadloom Rugs, Inc.,*

*supra,* 328 Md. at 61, 612 A.2d 1294. In addition, appellees examined other experts on the same issue, without objection. Consequently, we are satisfied that the propriety of Dr. Alger's testimony is not properly before us.

### III.

Appellants' third issue is integrally related to their first issue. They contend that the trial court erred in ordering the use of the transcript of Dr. Osborne's testimony from the first trial in June 1999, in lieu of delaying the trial in order to obtain his live testimony. They note that Dr. Osborne's testimony at the first trial pertained only to liability, because the case was initially bifurcated for trial. Thus, they complain that Dr. Osborne never had an opportunity to render an opinion as to the Browns' "mental anguish," suffered as a result of the loss of their baby. In their view, "the trial Court denied the Appellants an opportunity to present that opinion to the jurors which prejudiced the Plaintiff's [sic] case at trial."

In the half page that appellants devote to this issue, they fail to direct our attention to any legal authority in support of their contention. As we see it, the claim lacks merit.

In the first place, the court never *ordered* appellants to use the testimony of Dr. Osborne from the first trial. Rather, in the exercise of its discretion, the court denied a request for postponement. Based on the facts that we previously set forth, we are readily satisfied that the court did not abuse its discretion in denying the postponement request. *See Green v. Director, Patuxent Institution,* 3 Md.App. 1, 4, 237 A.2d 463 (1968). As a consequence of the denial, the court gave appellants the option of either using Dr. Osborne's earlier trial testimony or proceeding without any evidence from him.

To be sure, on March 22, 2000, when the court first considered the use of Dr. Osborne's prior testimony, appellants' counsel expressed concern about the limited scope of that prior testimony. The following colloquy is relevant:

[APPELLANTS' COUNSEL]: Again, Your Honor, [the first trial] was a bifurcated trial, and there were a lot of rulings with regards to inquiries in the area of damages, and I am not sure if we can actually be—

[THE COURT]: Dr. Osborne was a liability witness; right?

[APPELLANTS' COUNSEL]: He was.

[THE COURT]: Not a damage witness.

[APPELLANTS' COUNSEL]: With respect to—there is an area with respect to mental anguish which has to be with them being trained as OB/GYN physicians to recognize when a patient has suffered mental anguish from these kind of losses and referring that patient to a psychiatrist.

So there is that area which we had attempted to have Dr. Osborne testify as an expert in that area, which counsel objected to and in which counsel had previously acknowledged that the American College of Obstetrics and Gynecology even trains these doctors to be able to evaluate these patients for this kind of condition so that there is an issue with that, and that was an area I wasn't able to bring up with Dr. Osborne at the trial.

\* \* \*

THE COURT: What do you [appellees' counsel] have to say about his argument that there were certain objections sustained in the earlier trial because it was bifurcated that would be admissible if it were not a bifurcated trial?

[APPELLEES' COUNSEL]: That he was presented as a liability only witness. There has been no expert identification or supplemental answer to interrogatory or informal letter that has ever notified me that he is going to be testifying as to psychiatric damages.

They have two psychiatrists to testify.

THE COURT: I think—

[APPELLANTS' COUNSEL]: Your Honor, I did notify him, and it is in the records that I did provide a supplemental pre-trial statement.

It is in the records in which I indicated that Dr. Osborne was an expert, was qualified to render opinions with respect to patients who have suffered this kind of loss, and they have suffered some kind of mental anguish for them to be referred to a psychiatrist.

It is in the pre-trial, and I did give a copy to—I did send you a copy. This was a month ago, about a month or two ago.

[APPELLEES' COUNSEL]: I mean, I can debate whether that is present or not. Let's assume it is. He has two psychiatrists on tap to testify to that very issue tomorrow.

Ultimately, appellants elected to use the earlier testimony. Accordingly, the trial court carefully explained to the jury the use of prior testimony, stating, in part:

Now, at this time we are ready to continue, and I should explain to you the procedure about to be employed.

You have already learned through the course of this trial that our Rules provide for the taking of depositions before trial. In addition to that-and you have learned that these depositions may be taken at various places.

They are simply swearing in a witness the same as a witness is sworn in here, with the presence of counsel for both sides, and questioning, cross-examination, direct, redirect, exactly as it would occur in a courtroom.

And sometimes these depositions are used. Now, occasionally they are used—and you have seen them used primarily for purposes of asking a witness if in fact the witness did not say something on a previous occasion and refreshing their recollection or impeaching the witness's current testimony with prior testimony.

That is certainly a legitimate use of depositions. Both sides have utilized depositions for this purpose.

Sometimes depositions are used in lieu of the attendance of a witness and simply are read into evidence. Occasionally they are done even by videotape sometimes, and we play the videotape. So, there are a number of ways they are done.

\* \* \*

Any testimony that qualifies, that is has been taken under oath and when both sides have an opportunity to be present and ask questions—qualifies for use at the trial.

And that is what we are going to do now. In lieu of calling as a witness in person, Dr. Newton Osborne, we are going to have read to you the testimony of Dr. Osborne, which will include the direct testimony and cross-examination.

▮ We perceive no merit to appellants' claim that they were prejudiced because, in using Dr. Osborne's earlier testimony, they were denied the opportunity to present testimony from Dr. Osborne concerning mental anguish. As appellees point out, such testimony would have been cumulative, because appellants "had the benefit of expert testimony on mental pain and anguish" from two other witnesses. Moreover, given the jury's verdict, it never reached the issue of damages.

▮ Furthermore, it is well settled that the "admissibility of expert testimony is within the sound discretion of the trial court, and its action will seldom constitute a ground for reversal." *Pepper v. Johns Hopkins Hosp.*, 111 Md.App. 49, 76, 680 A.2d 532 (1996), *aff'd*, 346 Md. 679, 697 A.2d 1358 (1997); *see also Buxton v. Buxton*, 363 Md. 634, 651, 770 A.2d 152 (2001); *Radman v. Harold*, 279 Md. 167, 173, 367 A.2d 472 (1977). "The trial court's determination is reversible [only] 'if it is founded on an error of law or some serious mistake, or if the trial court clearly abused its discretion.' " *Pepper*, 111 Md.App. at 76–77, 680 A.2d 532 (citation omitted) " 'An appellate court will only reverse upon finding that the trial judge's determination was both manifestly wrong and substantially injurious.' " *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md.App. 605, 641, 698 A.2d 1167, *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997) (citation omitted); *see also Starfish Condo. v. Yorkridge Service*, 295 Md. 693, 458 A.2d 805 (1983); *Klein v. Weiss*, 284 Md. 36, 55–56, 395 A.2d 126 (1978).

*Myers v. Alessi*, *supra*, 80 Md.App. 124, 560 A.2d 59, is instructive. There, a patient brought suit against her physi-

cian to recover for alleged negligence and failure to diagnose cancer at the base of the patient's tongue. At trial, the patient presented three expert witnesses who testified that the doctor breached the applicable standard of care by failing to conduct an extensive examination of the patient's mouth. In addition, the patient asked the court to permit the jury to hear the transcript of the testimony of another physician, from an earlier arbitration hearing, arguing: "His opinions were the same as the other experts who testified for [the patient] at trial regarding the applicable standard of care." *Id.* at 130, 560 A.2d 59. After the doctor objected, the trial court excluded the transcript. On appeal, we affirmed, stating:

Even if we had determined that the trial court erred in excluding [the other doctor's] transcript, the error was not prejudicial. As noted by the Court of Appeals in *Harris v. Harris,* 310 Md. 310, 319, 529 A.2d 356 (1987), "to justify reversal two things are essential. There must be error and there must be injury; and unless it is perceived that the error causes the injury there can be no reversal merely because there is error." (quoting *Joseph Bros. Co. v. Schonthal,* 99 Md. 382, 400, 58 A. 205 (1904)). The burden of demonstrating both error and prejudice is on the complaining party. *Beahm v. Shortall,* 279 Md. 321, 330, 368 A.2d 1005 (1977). *Here, the substance of [the other doctor's] testimony had been echoed by three other expert witnesses, each of whom testified that he was familiar with the standard of care for a general or family practitioner. Thus, [that] testimony would have been merely cumulative evidence presented to the jury. The exclusion of his testimony, therefore, would not be grounds for reversal. See Hutchison v. Balto. Gas & Elec. Co.,* 241 Md. 329, 333–34, 216 A.2d 573 (1966); *State Roads Comm'n v. Kuenne,* 240 Md. 232, 235, 213 A.2d 567 (1965).

Here, Dr. and Mrs. Brown presented the testimony of two experts, both of whom testified as to the psychiatric injuries they sustained as a result of the tragic death of their baby. Any further testimony as to their mental anguish would have

been cumulative. Therefore, any error did not prejudice appellants.

## IV.

Appellants argue that the trial court erred in its instructions to the jury regarding the law of wrongful death, and therefore erred in denying the motion for new trial. They assert that the trial court "omitted the fact that if Baby Brown had been born alive, a wrongful death claim may have been maintained." Moreover, they suggest that Dr. Donald Levitt intentionally decapitated the baby during birth, so that the baby would not be born alive, in order to avoid a wrongful death suit. They assert: "[H]ad the Trial Court instructed the Jury that Appellants would have had a wrongful death claim if Baby Brown was born alive, the jurors may have made a reasonable inference that Dr. [Donald] Levitt decapitated Baby Brown to avoid a wrongful death lawsuit."

The trial court instructed the jury, in pertinent part:

And obviously, as you know, and as the evidence is clear, at the time that this child was delivered, at the time that this spontaneous abortion occurred, there was—the child was not viable.

And by "viable," the Maryland law means this: That if the child is—is the child capable of survival outside the womb, and the answer for a child of this age of gestation is "no." That's a matter of law. This child was not viable, could not have lived, and therefore the parents of the child delivering at this age have no claim for what we call "wrongful death" or a "survival action."

Wrongful death or a survival action allows in some cases a parent, for example, to claim [solatium] damages, damages for the loss of companionship and counseling and company of the child, during the child's entire minority when the child would be growing up.

That is not a claim that can be made or is being made in this case. You would not consider damages for such.

At the hearing on appellants' new trial motion, the court ruled:

Similarly, with respect to the failure to give an instruction that if the baby had been born alive, a wrongful death case could have been maintained even though the infant was non-viable, we did not take the time to research the underlying legal legitimacy of that because I was persuaded at the time and continue to be persuaded that there was no justification in the evidence for the giving of such an instruction.

I think I understood and believe I still understand the point that counsel is trying to make. I thought then and think now that the potential for jury obfuscation was far greater than any possibility of relevance, and indeed *there just was no testimony to support the rather extraordinary theory that plaintiffs wanted to inject in this case, that the doctor somehow caused the death of this infant during delivery intentionally in order to avoid a wrongful death claim, knowing that it was a non-viable infant and therefore causing death to avoid such a claim.*

*That is rather bizarre. There was nothing in the evidence to support it.*

(Emphasis added).

On April 14, 1999, the court granted summary judgment on the wrongful death claim. At the trial in March 2000, no evidence was presented to establish that Dr. Donald Levitt acted intentionally in decapitating the baby. Therefore, we agree with appellees that "the Trial Court did not abuse its discretion in refusing to instruct the jury on [wrongful death]." Additionally, as appellees argue, "there can be no error in the Trial Court's instructions regarding wrongful death because the jury did not reach the issue of damages in this case."

Maryland Code (1974, 1998 Rep. Vol.), § 3–902(a) of the Courts and Judicial Proceedings Article ("C.J.") provides: "An action may be maintained against a person whose wrongful act causes the death of another." C.J. § 3–904(a) provides: "An action under this subtitle shall be for the benefit of the wife, husband, parent, and child of the deceased person." But,

in *Kandel v. White*, 339 Md. 432, 436, 663 A.2d 1264 (1995), the Court held that a cause of action for wrongful death may not be maintained on behalf of a nonviable fetus that is stillborn. *See also Group Health Ass'n, Inc. v. Blumenthal*, 295 Md. 104, 119, 453 A.2d 1198 (1983) (recognizing that "a cause of action lies for the wrongful death of a child born *alive* who dies as a result of injuries sustained while *en ventre sa mere.*") (Emphasis added). Consequently, under Maryland law, a wrongful death claim lies only if the fetus is viable.

In this case, there was no evidence that the fetus was viable at birth. In Dr. Osborne's deposition of December 22, 1998, which was an exhibit to appellants' opposition to summary judgment, he said, in part:

[DEFENSE COUNSEL]: As a professor of obstetrics and gynecology, do you have an opinion, to a reasonable degree of medical probability, as to whether or not a 20 to 21–week fetus would be viable if delivered at that gestation?

[DR. OSBORNE]: Yes, I have an opinion.

[DEFENSE COUNSEL]: What's that opinion?

[DR. OSBORNE]: From what I know and from what I have seen ... I don't think ... that it would be viable at this point.

Furthermore, appellants' theory that Dr. Donald Levitt intentionally decapitated the baby to avoid a wrongful death suit was little more than total surmise, unsupported by any evidence in the record. Again, deposition testimony of Dr. Osborne is pertinent:

[DEFENSE COUNSEL]: Now, you also were asked to look at the case and determine whether or not you had an opinion with regard to Dr. Levitt's role in the case?

[DR. OSBORNE]: Yes.

[DEFENSE COUNSEL]: Did you find that Dr. Levitt intentionally killed this baby?

[DR. OSBORNE]: I couldn't find—when you say intentionally killed the baby, you mean when decapitation occurred if he did that intentionally with aforethought and so forth?

[DEFENSE COUNSEL]: Whether he intentionally aborted the baby, whether he was responsible for performing a partial birth abortion of the baby?

[DR. OSBORNE]: Yes, from my review of the records I couldn't come up with that conclusion.

In addition, Dr. Donald Levitt testified at the third trial, as follows:

[APPELLANTS' COUNSEL]: Now, Doctor, let us assume that this baby was dead, for the sake of this question.

[DR. LEVITT]: Okay.

\* \* \*

[APPELLANTS' COUNSEL]: [W]hat was the complication that stopped you from delivering the baby without the head being attached from the body?

[DR. LEVITT]: All right. Well, I think I have to go through the entire delivery.

[APPELLANTS' COUNSEL]: Okay. Explain it.

[DR. LEVITT]: Okay. There were two feet, classical breech, as you straightened out the legs, which is easy to do. They were right there.

You rotate the baby because the baby, as a breech, must be delivered head down. The diameter—this diameter—is much too big for delivery, you want this diameter even on a small one.

Because the lower uterine segment is a muscle, and that dilates as far as it has to dilate. It doesn't dilate on its own, it dilates because there's a presenting part that's pushing it aside.

So I turned it over. You use a towel on the buttocks and you gradually pull down and then you shift to the left, right arm, left arm, and now I have the baby in the palm of my hand.

The baby was 10 inches from crown to toe. According to the pathologist, the head was—

[APPELLANTS' COUNSEL]: I'm talking about that.

[DR. LEVITT]:—two inches—

\* \* \*

[DR. LEVITT]: And then the—

[APPELLANTS' COUNSEL]: (Inaudible).

[DR. LEVITT]:—neck, which I could see, was no thicker than a ballpoint pen. Completely loose and flaccid, not [sic] heartbeat in my palm.

I did a classical breech. I pushed the head down to try and engage this—this is called the occiput, and if you can engage it, then you put your finger in the cervix just to give it as much room. Pick it up and remove the head.

Well, when I did the downward pressure, minuscule stalk, limp fetus, it simply separated. . . .

Dr. Alger also testified at trial as to the potential for harm to the fetus, given the circumstances of this case. She said:

This is a terrible situation to be in, for the patient, the husband, and for the obstetrician. Nothing good is going to come of this whole situation, no matter what.

First of all, you are guaranteed, no matter how the baby is delivered, that the baby is going to die. There is a 100-percent mortality rate in a delivery at this gestation. So that's inevitable. So it's bad to begin with.

Now what we have is we have a woman who has delivered the body of a fetus that—a baby that she wanted very much, and this is hanging out between her legs. And what do you do at this situation?

When you decide to try to deliver the baby, you're not doing it with the idea that you're purposely going to try to separate the baby's head from the torso.

You're trying to expedite the delivery, because here are your alternatives.

(1) In most situations, the baby is already dead at this time. Because the baby is so small, as it comes down the vagina, by the time it's coming of the introitus. . . .

The opening of the vagina—the opening of the vagina coming out—the umbilical cord has already been compressed against that body of the baby, because it's already

down in the vagina, the length of the baby being such that it's getting compressed by the vaginal walls and it's cutting off the blood supply to the baby.

So, usually, these babies are born either stillborn or moribund with just a heartbeat.

So, you have—one possibility is the baby is already dead, and she has a dead fetus hanging between her legs. And I think that's a very stressful situation to be lying there knowing that this fetus is hanging out of there and that's your baby.

So that I, as an obstetrician, am going to attempt to expedite that delivery and not leave you hanging there, you know, in this situation that's very stressful, if I can go ahead and deliver this baby.

The other alternative is that maybe the baby is still live-born. And so, then I have the alternative of this baby that is potentially live there, but is slowing [sic] dying right between the mother's legs before her—if she could feel it move or anything and then it just stops and it's just lying there, that, to me, would be incredibly stressful.

So my natural instinct to try to help my patient is to try to expedite that delivery, so that she doesn't have to go through that.

And in most cases, I will be able to accomplish that delivery without any injury to the fetus and be able to wrap the fetus in a towel, take it away, present it to her later on when she can cope with this.

*Occasionally—it's not common—because the fetus is so fragile at that gestational age, without even using much force at all, this can occur. The head can separate from the torso.*

*And this is not the fist time that any obstetrician who deals with this will have heard of this. It does happen.*

*But that's not your intent when you're doing this, and it can happen using judicious force.*

\* \* \*

> *It's just the nature of delivery that has this as a possible outcome.*

(Emphasis added).

It is well settled that a "party is entitled to have his or her theory of the case presented to the jury, *provided that the theory is legally and factually supported." Shapiro v. Massengill,* 105 Md.App. 743, 761, 661 A.2d 202, *cert. denied,* 341 Md. 28, 668 A.2d 36 (1995) (emphasis added). Thus, "a trial court must properly instruct the jury on a point of law that is supported by some evidence in the record." *Green v. State,* 119 Md.App. 547, 562, 705 A.2d 133 (1998). "In reviewing the propriety of a trial court's denial of a requested jury instruction, we must examine 'whether the requested instruction was a correct exposition of the law, *whether that law was applicable in light of the evidence before the jury,* and finally whether the substance of the requested instruction was fairly covered by the instruction actually given.' " *Farley v. Allstate Ins. Co.,* 355 Md. 34, 47, 733 A.2d 1014 (1999) (emphasis added) (quoting *Wegad v. Howard St. Jewelers,* 326 Md. 409, 414, 605 A.2d 123 (1992)); *see Molock v. Dorchester County Family YMCA, Inc.,* 139 Md.App. 664, 671, 779 A.2d 963 (2001); *Jacobs v. Flynn,* 131 Md.App. 342, 383, 749 A.2d 174, *cert. denied sub nom. Kishel v. Jacobs,* 359 Md. 669, 755 A.2d 1140 (2000); *Green,* 119 Md.App. at 563, 705 A.2d 133; Md. Rule 2–520(c).

Here, we are amply satisfied that the court did not err in failing to instruct the jury on wrongful death or on appellants' theory as to intentional decapitation. Neither claim was supported by any evidence in the record.

**APPELLANTS' MOTION TO PROCEED *PRO SE* GRANTED; JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**